**2023-2106**

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

U.S. WELL SERVICES, LLC,
*Appellant,*

v.

HALLIBURTON ENERGY SERVICES, INC.,
*Appellee.*

---

On Appeal from United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2022-00074,
U.S. Patent No. 10,254,732

---

## CORRECTED REPLY BRIEF OF APPELLANT
## U.S. WELL SERVICES, LLC

---

Matthew J. Dowd
Robert J. Scheffel
Dowd Scheffel PLLC
1717 Pennsylvania Ave., NW
Suite 1025
Washington, D.C. 20006
(202) 995-9175
mdowd@dowdscheffel.com
rscheffel@dowdscheffel.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ................................................................................. 1

ARGUMENT ........................................................................................ 3

I.     Halliburton Agrees That The Indefiniteness Analysis Must Assess Whether The "Configured To Pump . . . At High Pressure" Limitation Is The "Asserted Advance" ........................... 3

II.    Halliburton Incorrectly Categorizes The Supreme Court Precedent As "Inapt" ........................................................................ 9

III.   The Board Identified No Cases Where The Term "High Pressure" Has Been Deemed Indefinite ........................................ 13

IV.    The Term "High Pressure" Is Common And Well Understood In Hydraulic Fracturing ................................................................ 14

V.     The Claim Language Informs A Skilled Artisan With Reasonable Certainty About The Claimed Improvement ............. 21

VI.    The Board's Demand For A "Numerical Definition" Or "Precise Boundaries" Is Erroneous ............................................... 24

VII.   Substantial Evidence Does Not Support The Board's Ruling That Amended Claims 14-26 Are Indefinite ................................. 27

VIII.  There Was No Waiver .................................................................... 31

IX.    Conclusion ..................................................................................... 32

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aqua Products Inc. v. Matal,*
    872 F.3d 1290 (Fed. Cir. 2017) (en banc)............................................ 15

*Atlas Global Technologies LLC v. Zyxel Networks Corp.,*
    No. 6:22-cv-355-ADA,
    2023 WL 3361214 (W.D. Tex. May 9, 2023) ......................................... 6

*BASF Corp. v. Johnson Matthey Inc.,*
    875 F.3d 1360 (Fed. Cir. 2017) ........................................ 3, 4, 5, 6, 10

*BJ Services, Co. v. Halliburton Energy Services, Inc.,*
    338 F.3d 1368 (Fed. Cir. 2003) ..................................................... 17, 20

*Cox Communications v. Sprint Communications Co.,*
    838 F.3d 1224 (Fed. Cir. 2016) ............................................................ 23

*Datamize, LLC v. Plumtree Software, Inc.,*
    417 F.3d 1342 (Fed. Cir. 2005) ............................................................ 14

*Ecolab, Inc. v. Envirochem, Inc.,*
    264 F.3d 1358 (Fed. Cir. 2001) ............................................................ 25

*Eibel Process Co. v. Minnesota & Ontario Paper Co.,*
    261 U.S. 45 (1923) ................................................................. 9, 10, 13

*EIS, Inc. v. Intihealth Ger GmbH,*
    No. 19-1227-GBW,
    2023 WL 346631 (D. Del. Jan. 9, 2023) ............................................... 6

*Energizer Holdings v. International Trade Commission,*
    435 F.3d 1366 (Fed. Cir. 2006) .............................................................. 1

*ERBE Elektromedizin GmbH v. Canady Technology LLC,*
    629 F.3d 1278 (Fed Cir. 2010) ............................................................. 23

*Invitrogen Corp v. Biocrest Manufacturing, LP*,
    424 F.3d 1374 (Fed. Cir. 2005) ..................................................... 13, 26

*Modine Manufacturing Co. v. U.S. International Trade Commission*,
    75 F.3d 1545 (Fed. Cir. 1996) ..................................................... 23, 25

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014) ..................................................................... 10, 15

*Nevro Corporation v. Boston Scientific Corp.*,
    955 F.3d 35 (Fed Cir. 2020) ................................................... 13, 22, 23

*Niazi Licensing Corp. v. St. Jude Medical SC*,
    30 F.4th 1339 (Fed. Cir. 2022) ........................................................ 17

*Pickholtz v. Rainbow Technology Inc.*,
    284 F.3d 1365 (Fed. Cir. 2022) ....................................................... 23

*Power-One, Inc. v. Artesyn Technologies Inc.*,
    599 F.3d 1343 (Fed. Cir. 2010) ........................................................ 26

*Ravgen, Inc. v. Ariosa Diagnostics, Inc.*,
    No. 20-1646-RGA-JLH,
    2023 WL 4418340 (D. Del. July 10, 2023) ......................................... 6

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*,
    537 F.3d 1357 (Fed. Cir. 2008) ........................................................ 13

*Tilghman v. Proctor*,
    102 U.S. 707 (1881) ..................................................... 9, 10, 11, 12, 13

*Twinstrand Biosciences, Inc. v. Guardant Health, Inc.*,
    No. 21-1126-GBW-SRF,
    2020 WL 94939469 (S. D. Tex. Sept. 18, 2022) ................................... 6

*U.S. Well Services, LLC v. TOPS Well Services, LLC*,
    No. 3:19-cv-00237,
    2020 WL 9439469 (S.D. Tex. Sept. 18, 2020) ......................... 29, 30, 31

*Ultimax Cement Manufacturing Corp. v.*
　　*CTS Cement Manufacturing Corp.*,
　　587 F.3d 1339 (Fed. Cir. 2009) ............................................................... 1

*Unicorn Energy GmbH v. Tesla Inc.*,
　　No. 21-cv-07476-BLF, 2023 WL 322891 (N.D. Cal. Jan. 19, 2023) ..... 6

*United Access Technologies, LLC v. AT&T Corp.*,
　　757 Fed. App'x 960 (Fed. Cir. 2019) ..................................................... 26

*Young v. Lumenis, Inc.*,
　　492 F.3d 1336 (Fed. Cir. 2007) ....................................................... 26, 27

**Statutes**

35 U.S.C. § 112(b) ................................................................... 4, 10, 16, 26

**Rules**

37 C.F.R. § 42.12(d)(2) (2022) ................................................................ 15

# INTRODUCTION

> Claim definiteness is analyzed not in a vacuum, but always in light of the teachings of the prior art and of the particular application disclosure as it would be interpreted by one possessing the ordinary level of skill in the pertinent art.

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1353 (Fed. Cir. 2009) (quoting *Energizer Holdings v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006) (quotation marks omitted)).  This particular guidance has all the more relevance in the present case, where the full context of both the challenged claim limitation and the invention as a whole illuminates the Board's error.

The narrow improvement to the claimed hydraulic-fracturing system and method employs a real-time remote proppant monitoring system, in which datavan operators can control the proppant storage systems using the remote monitoring system.  Appx0044-0045.  As with many inventions, the novel real-time proppant monitoring apparatus and method used some components that are well-known in the industry.  In this case, one such component is the "electric-powered pump[] . . . configured to pump fluid . . . at high pressure so that the fluid passes from the well into the formation and fractures the formation."  Appx3464-3465.

Despite such high-pressure pumps being well-known in the industry, Halliburton convinced the Board to deem the proposed substitute claims as indefinite. The Board made that ruling even though the Board itself had no difficulty understanding the original claims for purpose of institution and even though USWS's amendment had absolutely no connection to the "configured to pump . . . at high-pressure" limitation.

The prior art also confirmed that skilled artisans generally understand what was meant by "configured to pump . . . at high pressure" as it related to hydraulic fracturing. Halliburton did offer expert testimony, but its expert was looking for "precise boundaries." The Board also wanted a "numerical definition." Neither is required under this Court's precedent.

In sum, the Board erred by demanding numerical precision for a well-known conventional limitation that was not the asserted advance of the wireless proppant monitoring invention. Halliburton's indefiniteness contention was unrelated to the proposed amendments, which added transceivers, a data converter, a camera, and other features for monitoring the proppant. *See* Appx3464-3468. The "configured to" and "high pressure" limitations remained unchanged. The "configured to pump . . .

at high pressure" limitation was never questioned during prosecution. Nor did Halliburton base its IPR challenge on the purported "indefiniteness" of using a conventional high-pressure fracturing pump. Based on this record, Halliburton failed to meet its burden to show that a skilled artisan would not reasonably understand the claimed proppant-monitoring method and apparatus.

Finally, there is no dispute that both of USWS's experts agreed that "high pressure" includes 8,000 to 12,000 psi, at a minimum. Halliburton's expert never identified any range that he believed could be "high pressure." Thus, even accepting the Board's erroneous demand for a "numerical range," the claim limitation should have been understood to cover at least the undisputed range of 8,000 to 12,000 psi.

## ARGUMENT

## I.    Halliburton Agrees That The Indefiniteness Analysis Must Assess Whether The "Configured To Pump . . . At High Pressure" Limitation Is The "Asserted Advance"

As this Court has explained, the indefiniteness analysis must consider whether the disputed claim limitation is directed to the "patentable advance over the prior art." *See, e.g.*, *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017). This consideration is

important, as Halliburton itself now recognizes. *See* Resp. Br. 18 (stating that "the asserted advance may be part of that relevant context" when assessing compliance with 35 U.S.C. § 112(b)). Indeed, without considering the "asserted advance," the Board would be free to strike down claims that might contain the slightest of ambiguities having no impact on the novelty and nonobviousness of the claimed invention.

Unfortunately, that outcome is precisely what occurred in this case. Here, the limitation "configured to pump . . . at high pressure" is used in the context of describing a type of well-known fracturing pump as part of the claimed fracturing system. The complete claim language sufficiently and reasonably informs a person skilled in hydraulic fracturing about the claimed invention. That well-known limitation is not the asserted advance of the amended claims.

Notably, Halliburton's response mischaracterizes USWS's position with respect to the holding of *BASF*. *See* Resp. Br. 18-19. Halliburton incorrectly argues that USWS contended that *BASF* stands for the proposition that "indefinite claim language is acceptable when that indefinite claim language is not directed to the asserted advance." *Id.* at 18. Of course, USWS did not advance that proposition or contend that *BASF*

stands for that proposition. *See* Opening Br. 41-45. Halliburton's "proposition"—which is essentially tautological—assumes that the disputed claim language is *a priori* indefinite. *BASF* does not stand for Halliburton's nonsensical proposition.

Consideration of the asserted advance is a necessary component of determining whether the language is, as a legal matter, indefinite. Indefinite claim language can never be "acceptable," as Halliburton seemingly asserts. Halliburton's response overlooks that the "asserted advance" consideration must inform the Board's analysis before the Board can conclude that Halliburton met its burden of proving that someone skilled in hydraulic fracturing would lack reasonable certainty about how to perform the method using an electric-powered pump "configured to pump . . . at high pressure." *See, e.g.*, *BASF*, 875 F.3d at 1368-69 (noting that "[i]t is in this context [of the asserted advance] that the question of the certainty or uncertainty experienced by a relevant skilled artisan in understanding the claims, read in light of the specification, is presented").

Contrary to Halliburton's resistance, district courts have regularly applied *BASF* and the asserted-advance doctrine when rejecting

5

indefiniteness challenges to patent claims. *See, e.g.*, *Ravgen, Inc. v. Ariosa Diagnostics, Inc.*, No. 20-1646-RGA-JLH, 2023 WL 4418340, at *4 (D. Del. July 10, 2023) ("[A]s the Federal Circuit explained in the *BASF* case, breadth is not indefiniteness."); *Twinstrand Biosciences, Inc. v. Guardant Health, Inc.*, No, 21-1126-GBW-SRF, 2023 WL 3773700, at *4, 6-7 (D. Del. June 2, 2023) (applying *BASF* and rejecting indefiniteness argument for "high accuracy" limitation because "[t]he claims do not require a quantitative accuracy or error rate" and "the mere presence of a surplus term in the claims does not render the 'high accuracy' terms indefinite"); *Atlas Global Techs. LLC v. Zyxel Networks Corp.*, No. 6:22-CV-355-ADA, 2023 WL 3361214, at *13 (W.D. Tex. May 9, 2023) (applying *BASF*); *Unicorn Energy GmbH v. Tesla Inc.*, No. 21-cv-07476-BLF, 2023 WL 322891, at *17-18 (N.D. Cal. Jan. 19, 2023) (applying *BASF* and rejecting arguments that a claim is indefinite merely because "it allows for too many different possible criteria for compatibility or incompatibility"); *EIS, Inc. v. Intihealth Ger GmbH*, No. 19-1227-GBW, 2023 WL 346631, at *18-19 (D. Del. Jan. 9, 2023) (applying *BASF* to reject indefiniteness argument for limitations "sealingly engage a portion of a body of a user

including a clitoris" because "'sealingly engage' does not require a perfect seal").

The issue of "asserted advance" is all the more important here, given the claim limitation's full context and how the indefiniteness issue was raised so late in the proceeding. To begin with, the "configured to pump . . . at high pressure" language of claim 14 is expressly included in the limitation specifying known electric-powered fracturing pumps:

> a plurality of electric-powered pumps fluidly connected to a well and powered by at least one electric motor, and configured to pump fluid into the well at high pressure so that the fluid passes from the well into the formation, and fractures the formation.

Appx0048. These types of high-pressure fracturing pumps were well known in the industry—a fact that Halliburton does not dispute. *See* Resp. Br. 19.; *see also* Appx0367 (Schlumberger patent application describing "high-volume, high-pressure pumps"); Appx0418 (same); Appx0918 (patent application referencing "high pressure pumping units"); Appx1337 (news article describing "mobile collections of high-pressure pumps"); Appx2224-2225 (Schaaf identifying the "Gardner Denver GD-2500Q pump" as "configured to pump fluid . . . at high pressure"); Appx2434-2448 (Hardin patent application repeatedly referencing "high

pressure pumps"); Appx2532-2540 (industry catalogue offering "high pressure pumps" for sale); Appx3694 (article discussing "high-pressure stimulation pumps").

Rather than denying that these pumps are well known in the industry, Halliburton attempts to downplay the significance of that fact. Resp. Br. 19. Halliburton argues that this fact "does not save indefinite claim language from unpatentability" and "does not sufficiently define the term 'high pressure,'" *id.*, but Halliburton mischaracterizes USWS's rationale for noting the undisputed knowledge about high-pressure pumps in the prior art.

Thus, the challenged claim limitation describes a standard mechanical component that was widely known in the prior art, was unlikely to create any uncertainty about its meaning, and was not the asserted advance of the '732 patent. In contrast, USWS's narrow asserted advance is an improved hydraulic-fracturing system and method for monitoring and controlling the proppant storage system. The description of the pumps as "high pressure" in the limitation at issue serves primarily to establish that the patent exists in the context of hydraulic fracturing where the pressure of water is used to fracture rock formations.

In the end, the Board failed to give due consideration to whether the complete "configured to pump . . . at high pressure" limitation relates to the asserted advance captured by the proposed amended claims. USWS's asserted advance argument goes directly to the main issue here—whether a person of skill in the art would reasonably understand how to make and use the claimed invention. The limitation "configured to pump . . . at high pressure" does not interfere with any understanding of the invention scope. The limitation merely describes the type of pumps that are commonly and routinely used in hydraulic fracturing. If these pumps are being used, then the person of skill would understand that they are in the same field as the patent and proceed to reviewing the claims related to the asserted advance.

## II.    Halliburton Incorrectly Categorizes The Supreme Court Precedent As "Inapt"

In *Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 65-66 (1923), the Supreme Court upheld the validity of claims directed to an improved process of making paper, even though those claims used the terms "high" and "substantial elevation." In *Tilghman v. Proctor*, 102 U.S. 707, 709 (1881), the Court upheld the validity of a patent directed to "the manufacturing of fat acids and glycerine from fatty bodies

by the action of water at a high temperature and pressure." Both cases still offer significant guidance when applying the indefiniteness standard under 35 U.S.C. § 112(b). The Supreme Court recently confirmed as much. *See Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909 n.5 (2014) (citing *Eibel Process* with approval).

Halliburton wants to sweep aside the Supreme Court guidance by categorizing it as "inapt." Resp. Br. 19-20. USWS respectfully disagrees and submits that the Supreme Court precedent maintains its value in understanding the correct interpretation and application of the definiteness requirement of § 112(b). Indeed, *Tilghman* is addressing nearly an identical claim limitation of "high temperature and pressure." 102 U.S. at 709. Of course, indefiniteness must consider the full context and body of evidence in the record. When one does so, the facts and reasoning of *Tilghman* provide further support for why USWS's proposed amended claims to an improved proppant monitoring hydraulic-fracturing apparatus and method are not indefinite. *Tilghman* also provides doctrinal support for the asserted-advance doctrine applied in *BASF* and other cases.

The Supreme Court in *Tilghman* recognized that the invention was sufficiently detailed even though "other forms of apparatus, known and in public use at the time, can as well be employed without changing the process." 102 U.S. at 719. In other words, the Court appreciated that Tilghman's "heated coil of pipe standing in a furnace" was just one apparatus that could be used, and others were known in the art. *Id.* The lack of specificity with respect to a well-known apparatus that could be used in Tilghman's novel process was not cause to invalidate the patent. *Id.* at 720 ("No great amount of invention was required to adapt different forms of well-known apparatus to the application of the process.").

The Court was also unswayed by arguments against the use of "high temperature" in the claim. *Id.* at 720-21. The Court repeatedly discussed how those in the field would understand how to carry out variations of the process within the claimed "high temperature and pressure" limitation. *Id.* at 720. It was "evident," the Court explained, that the high-temperature process "could be accomplished by means of revolving reels armed with buckets, or a force-pump constantly transferring the heavy stratum of water from the bottom of the mass to the top." *Id.*

The Court's ruling in *Tilghman* fully supports USWS's position on why the Board failed to correctly apply the asserted advance and why it erred when ruling that limitation to a well-known type of pump was indefinite.

Like here, the apparatus used to perform the novel method was not the asserted advance of Tilghman's process. Moreover, the Court recognized that a skilled artisan would understand "high temperature and pressure" when read in the context of the purpose of the claimed process.

> [H]is "invention consists of a process for producing free fat acids and solution of glycerine from those fatty and oily bodies of animal and vegetable origin, which contain glycerine as a base;" that "for this purpose he subjects these fatty and oily bodies to the action of water at a high temperature and pressure, so as to cause the elements of those bodies to combine with water and thereby obtain at the same time free fat acids and solution of glycerine;" that he "mixes the fatty body to be operated upon with from a third to a half of its bulk of water, and the mixture may be placed in any convenient vessel in which it can be heated to the melting-point of lead" [which is afterwards explained to be only desirable for a quick result, not essential]; that "the vessel must be closed and of great strength, so that the requisite amount of pressure may be applied to prevent the conversion of the water into steam." This is the process which the patentee claims to have invented; and this description of it gives the proper construction and qualification to the claim.

*Id.* at 729-30 (bracketed text in original).

12

Thus, just as the *Tilghman* Court explained how knowledge in the art and the full invention description provided the proper "qualification to the claim," *id.* at 730, the same "qualification to the claim" should apply here when skilled artisans readily knew of electric-powered pumps that were "configured to pump . . . at high pressure." After all, "[d]efiniteness does not require that a potential infringer be able to determine *ex ante* if a particular act infringes the claims." *Nevro Corp. v. Boston Sci. Corp.*, 955 F.3d 35, 40 (Fed. Cir. 2020) (citing *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1372-73 (Fed. Cir. 2008); *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005)). The standard requires reasonable certainty to practice the claimed invention, with an eye towards the invention's asserted advance.

## III. The Board Identified No Cases Where The Term "High Pressure" Has Been Deemed Indefinite

Notably, Halliburton does not identify a single case in which the term "high pressure" (or some other comparable term of degree) was held to be indefinite. In other words, Halliburton has not identified a single case that goes against the holding or reasoning of *Eibel Process* or *Tilghman*.

Halliburton's lack of case-law support is unsurprising. Terms of degree are typically subject to a reasonably certain understanding by those of ordinary skill in the art, including in the hydraulic-fracturing industry. As USWS's experts explained, those skilled artisans would be aware of the relevant factors. Appx2063-2064; Appx2221-2222.

Terms of degree are, of course, starkly different from purely subjective terms. As USWS detailed in its opening brief, purely subjective terms are frequently held to be indefinite. *See* Opening Br. 51-53. In response, Halliburton incorrectly stated that its cited subjective terms are "similar to 'high pressure.'" Resp. Br. 21-22. Halliburton fails to acknowledge the difference between terms of degree, such as high pressure, and purely subjective terms, such as "aesthetically pleasing." *See Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1344-45 (Fed. Cir. 2005).

## IV. The Term "High Pressure" Is Common And Well Understood In Hydraulic Fracturing

Halliburton's response confirms that the term "high pressure" is a common term used in the hydraulic fracturing industry, especially when describing the configuration and pump capacity of hydraulic-fracturing pumps. Halliburton's response brief accepts the evidence identifying

14

numerous examples, although Halliburton contends, without any elaboration, that the numerous examples are taken out of context. *See* Resp. Br. 15-18.

The extensive, common usage of "high pressure" is important, in view of Halliburton's burden to show unpatentability. Here, Halliburton does not dispute that it had the burden to prove that the proposed substitute claims (with the "configured to pump . . . at high pressure" limitation) are indefinite. *See Aqua Prods. Inc. v. Matal*, 872 F.3d 1290, 1296 (Fed. Cir. 2017) (en banc); 37 C.F.R. § 42.12(d)(2) (2022) ("A petitioner bears the burden of persuasion to show, by a preponderance of the evidence, that any proposed substitute claims are unpatentable."). Halliburton had to prove with supporting evidence that amended claims 14-26 "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901.

Despite its acknowledged burden, Halliburton offered no evidence that one of skill in the art would be unable to understand "with reasonable certainty" the meaning of the limitation "electric-powered pumps . . . configured to pump . . . at high pressure." Halliburton's expert Durham did not offer an opinion on that question. *See* Appx3549-3550. Instead,

he recognized that "different engineers can reasonably come to different conclusions" about what is "high pressure." Appx3549. But the standard under 35 U.S.C. § 112(b) is not whether different engineers might reach different conclusions about whether a pump is "configured to pump . . . at high pressure." Experts and ordinarily skilled artisans routinely reach different conclusions about claim scope, and the mere difference of opinion does not render a claim unpatentable as indefinite.

When the record evidence is considered, a skilled artisan in the hydraulic-fracturing field would reasonably understand what is meant by "configured to pump . . . at high pressure" when used in the full context of a hydraulic-fracturing operation. Appx0367 (Schlumberger patent application); Appx0961-0971 (OSHA alert repeatedly using "high pressure" without further specificity); Appx1337 (news article referring to "high pressure pumps"); Appx1942-1944 (Halliburton's opposition identifying a business proposal that identifies a known specific prior-art pump that, according to Halliburton, meets the "configured to pump . . . at high pressure limitation); Appx2434 (Hardin patent application); Appx2518-2540 (industry product brochure with multiple uses of "high pressure" without any numerical definition); Appx3606 (Omont patent application);

16

Appx3709 ("Modern high-pressure 'hammerless' surface lines are rated to 15,000 psi and have field-proven sealing performance.").  Halliburton offered no evidence that a skilled artisan would need a numerical range to reasonably know how to pump at "high pressure" or which pumps are "configured to pump . . . at high pressure."  Resp. Br. 14-15.  This follows from a true understanding of the definiteness requirement, which "recogniz[es] that absolute precision is unattainable."  *Niazi Licensing Corp. v. St. Jude Med. SC*, 30 F.4th 1339, 1347 (Fed. Cir. 2022).

Halliburton even admits that the term "high pressure" "is not foreign to those skilled in the art."  Resp. Br. 15.  Although Halliburton attempts to minimize the importance of its common use, the weight of the evidence shows that skilled artisans would understand with reasonable certainty what is meant by "electric-powered pumps . . . configured to pump . . . at high pressure."  Halliburton itself has previously had no issue understanding the use of the term "high pressure" in a claim limitation.  *See BJ Servs., Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1370 (Fed. Cir. 2003).

For example, Halliburton's primary prior-art references use the term "high pressure" to explain the basic methodology of hydraulic

17

fracturing. *See* Appx0918-0921; Appx0961-0972; Appx2434; Appx3592. Halliburton does not dispute this common usage, and Halliburton's response does not squarely reconcile the common industry usage of "high pressure" and the well-known high-pressure pumps with the Board's unnecessary requirement for a numerical definition.

While the examiner's non-objection to "high pressure" is not, by itself, dispositive, it lends further support to USWS's position. The examiner reviewed numerous prior-art references and other documents using the term "high pressure" to describe hydraulic-fracturing components and processes. *See e.g.*, Appx0367-0368 (Schlumberger patent application); Appx0418 (same); Appx0523 (written opinion of the International Searching Authority for Schlumberger patent application); Appx0622 (Evolution Well Services patent application); Appx0639 (same). Not once did the examiner express any questions about or objections to using "high pressure" to describe the electric-powered fracturing pump.[1]

---

[1] Similarly, the Board initially had no concern about the claim limitation. In its preliminary guidance to USWS's motion to amend, the Board considered the full claim limitation, including "electric-powered pumps . . . configured to pump . . . at high pressure." Appx3394-3408. The Board's preliminary guidance did not raise any indefiniteness concerns. *Id.*

The ubiquity of electric-powered fracturing pumps "configured to pump . . . at high pressure" further undermines the Board's indefiniteness ruling. USWS provided various examples of fracturing pumps that are known to be configured to operate at a "high pressure." Opening Br. 35-36. Halliburton claims that USWS "points only to testimony from its experts," but this is inaccurate, as USWS identified numerous references to high-pressure fracturing pumps. *See id.* (citing Appx0367; Appx0416; Appx0622; Appx1337; Appx2434; Appx2532-2540). The identified, known fracturing pumps—like the claimed electric-powered fracturing pumps "configured to pump . . . at high pressure"—confirm that skilled artisans would be reasonably certain about the meaning of "configured to pump . . . at high pressure," especially in the full context of the '732 patent. *See* Appx2067 (Marscher testifying that a high-pressure hydraulic fracturing system "typically" "use[s] the triplex or quintuplex pump"); Appx2224-2225 (Schaaf identifying the Gardner Denver GD-2500Q

---

Halliburton also did not raise an indefiniteness argument until its opposition to USWS's revised motion to amend. *See* Appx1918; Appx3506-3507.

pump as one that can be "configured to pump fluid into a wellbore at high pressure").

Halliburton argues that USWS ignores the context in which the term "high pressure" is frequently used, but Halliburton's contention sidesteps the fact that "high pressure" is routinely used without further definitional guidance. *See BJ Servs.*, 338 F.3d at 1370 (using the term "high pressure" in a claim limitation that Halliburton itself did not challenge as indefinite). Moreover, the prior art establishes that the term "high pressure," when used without an explicit so-called "objective boundary," is readily understood by skilled artisans by reference to the functional aspects of hydraulic fracturing. *See e.g.*, Appx0918-0921 (prior-art application describing "high pressure pumping units" and a "high pressure ground manifold"); Appx2434 (prior-art application explaining that hydraulic fracturing "typically involves the use of a high pressure pump . . . to apply a high pressure fluid mixture . . . down the wellbore of an oil or gas well to fracture or crack the geologic formation").

USWS identified the common understanding of "high pressure"— evinced by its frequent use by third parties throughout the record—as additional evidence supporting its position that a person skilled in the

art would have no trouble understanding the claim scope. The '732 patent is in the field of hydraulic fracturing utilizing well-known high-pressure pumps. For this reason, the patent utilizes the standard description of these pumps as "high pressure" and also uses the language typically used when describing the methodology of hydraulic fracturing, *e.g.*, using fluid at high pressure to fracture a subterranean formation. *See* Appx0961; Appx2434. A skilled hydraulic-fracturing artisan would understand whether this field is relevant to his or her work prior to reviewing the asserted advance relating to proppant monitoring.

## V.   The Claim Language Informs A Skilled Artisan With Reasonable Certainty About The Claimed Improvement

The intrinsic record provides reasonable and objective boundaries for those of skill in the art to understand the meaning of the term "high pressure" in the full context of the claim limitation. The full context informs a skilled artisan that the electric pump used must be the type that can be configured to operate at a "high-pressure." Halliburton tries to fault USWS for relying on the claim language itself as its primary support, Resp. Br. 12-13, but the textual evidence is highly relevant. A skilled artisan would know that the meaning of "electric-powered pump[]

. . . configured to pump . . . at high pressure" is to be understood in relation to the pressure needed to "fracture[] a formation."

The proper reading of the claim must also consider the "configured to" limitation, which provides additional context for understanding "high pressure." Appx3464-3465. The only reasonable view of the evidence is that one skilled in the art would incorporate a suitable electric-powered pump that can be configured to operate at "high pressure"—whatever that pressure might be.

It recognizes that the electric-powered pumps that are part of the novel fracturing system can operate at various "high pressures." USWS's experts explained that skilled artisans would know how to apply the factors that determine the range of high pressure suitable for hydraulic fracturing. Appx2063-2065 (Marscher agreeing that the pressure needed might vary depending on the depth of a formation, the stage of the fracturing process, and the type of rock); Appx2221-2222 (Schaaf explaining that the exact pressure necessary is "dependent on the formation itself"). In this sense, the "configured to pump . . . at high pressure" is functional language that incorporates industry knowledge so that the claim scope is readily understood by skilled technicians. *See, e.g.*, *Nevro*, 955 F.3d at 39

("[W]e have held that functional language can 'promote[] definiteness because it helps bound the scope of the claims by specifying the operations that the [claimed invention] must undertake.'" (quoting *Cox Commc'ns v. Sprint Commc'n Co.*, 838 F.3d 1224, 1232 (Fed. Cir. 2016))).

Halliburton's position also puts too much reliance on its argument that USWS's construction "removes 'high' from the claim language." Resp. Br. 13. As this Court has recognized, "surplusage may exist in some claims." *ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1286 (Fed. Cir. 2010); *see also Pickholtz v. Rainbow Tech., Inc.*, 284 F.3d 1365, 1373 (Fed. Cir. 2002). Halliburton seemingly seeks to elevate its "surplusage" argument to a dispositive role, but this Court has explained that "[a]ll rules of construction must be understood in terms of the factual situations that produced them, and applied in fidelity to their origins." *Modine Mfg. Co. v. U.S. Int'l Trade Comm.*, 75 F.3d 1545, 1551 (Fed. Cir. 1996).

In some sense, Halliburton is correct that the term "high" is not necessary for one of skill in the art to understand the scope of the method and apparatus claims. A skilled artisan can readily determine the pressure needed to fracture a rock formation and needed to practice the

claimed invention.  By specifying that a particular known component is used—*i.e.*, "electric-powered pumps . . . configured to pump fluid into the well at high pressure"—an additional gloss is added to the claim scope.  But whether "high pressure" is included in the claim language is not critical to understanding the asserted advance or practicing the invention such that the fluid is pumped and "fractures the formation."  Although Halliburton may be unsatisfied with using terminology that is widespread in the industry, it is hard to imagine a scenario in which a skilled artisan would not reasonably understand how to make and use the fracturing system of amended claims 14-20 or how to perform the fracturing operation of amended claims 21-26.  Indeed, neither the Board nor Halliburton identified any such instance of being unable to practice the invention.

## VI.  The Board's Demand For A "Numerical Definition" Or "Precise Boundaries" Is Erroneous

The Board's final written decision was explicit and direct: USWS was faulted because its "own witnesses cannot agree on a *numerical* definition of 'high pressure.'"  Appx0030 (emphasis added).  The Board's desire for a "numerical definition" could not have been clearer.  Even so, Halliburton disputes this reading of the Board's decision, but without any

meaningful explanation of what the Board meant when it faulted USWS for not providing a precise "numerical range." The Board's clear desire for numerical precision conflicts with how this Court and others routinely address terms of degree.

Moreover, the Board's desire for a "numerical definition" flowed directly from the erroneous view of Halliburton's expert. Durham too was seeking numerical precision. Durham testified about the purported lack of "precise boundaries" for "high pressure." Appx3549 (¶ 17). But Durham's testimony about the lack of "precise boundaries" underscores how those skilled in the art understand that the term "high pressure" is not limited to a strict "numerical definition" but is situationally defined.

Halliburton does notably agree with USWS's "host of cases" confirming that "claims need not have a numerical definition to be definite." Resp. Br. 21. Indeed, numerous cases over the years have confirmed that terms of degree, such as "about," do not need a precise numerical definite. *E.g.*, *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) (holding the term "about" to be definite); *Modine Mfg.*, 75 F.3d at 1554 ("[T]he usage [of the term 'about'] can usually be understood in light of the technology embodied by the invention.").

For purposes of the present analysis, a term of degree, such as "high pressure," is no different than the similar term of degree "about," with respect to the definiteness requirement under § 112(b).  Absent actual evidence that a skilled artisan would not understand the structure of the claimed proppant monitoring system or apparatus with reasonable certainty, these terms of degree simply lead to choosing between competing claim constructions.  One party might offer a broad range for the term, while the other party might offer a narrower range, all based on competing evidence of how a skilled artisan would understand the term.  From there, the term can be applied to assess infringement.  That approach conforms to this Court's precedent.  *See, e.g.*, *Invitrogen*, 424 F.3d at 1383.

Numerous other cases confirm that terms of degree typically provide enough guidance to those skilled in the art.  *See, e.g.*, *United Access Techs., LLC v. AT&T Corp.*, 757 Fed. App'x 960, 968-70 (Fed. Cir. 2019) (non-precedential) (affirming district court's ruling that "high frequency" is not indefinite); *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348-49 (Fed. Cir. 2010) (affirming district court's ruling that the term "near" was not indefinite); *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345-

47 (Fed. Cir. 2007) (reversing district court's ruling that the term "near" was indefinite).

Rather than follow this precedent, the Board used the overlapping approximate ranges offered by USWS's expert as the only "proof" of indefiniteness.  If the same approach were applied to this Court's prior cases involving "about," essentially every patent in those cases would be deemed indefinite merely because the competing experts and witnesses disagreed with the scope of "about."

## VII.  Substantial Evidence Does Not Support The Board's Ruling That Amended Claims 14-26 Are Indefinite

The record as a whole, when viewed through the prism of Halliburton's burden to prove indefiniteness, confirms that the Board's decision is erroneous.  The Board's credited Durham's testimony even though it was entirely conclusory and failed to consider the numerous prior-art references using "high pressure" without any strict numerical range. Appx3549-3550.   The Board also entirely overlooked the fact that the testimony of USWS's experts established a consensus range of 8,000 psi to 12,000 psi, at a minimum, for what would be considered "high pressure."

The Board also erred for faulting USWS experts Marscher and Schaaf for not "cit[ing] any objective evidence to support their respective notions of what 'high pressure' might be." Appx0030. But the Board's criticism fails to appreciate that Durham's testimony also plainly fails to cite any objective evidence as support. Appx3549. Unlike Durham's testimony, Schaaf and Marscher's testimony was not taken in the context of determining the definiteness of the claim limitation "configured to pump . . . at high pressure." *See* Appx2061-2063 (Halliburton asking Marscher only about "high pressure" and not the full claim limitation at issue here); Appx2219-2220 (Schaaf: same). Durham's testimony should have certainly provided some evidentiary support, especially when his claims contradicted the evidence in the record that the term is readily understood in the industry.

Durham's testimony is relied upon by Halliburton and credited by the Board for the purportedly critical statement that there is no "universally accepted definition of 'high pressure,'" Appx0030, yet this statement is unsupported by any documentary evidence, Appx3549-3550. Durham's testimony also lacks any explanation as to how he could make such a definitive claim. *Id*. Notably, Durham's short, conclusory

assertion, limited to only six paragraphs, addresses none of the prior art documents that regularly use "high pressure" without further explanation and without a numerically precise definition. *Id.*

Marscher explained that fracturing at non-high pressure is not typical and is generally ineffective. Appx2065-2066. He testified that fracturing at less than high pressure would "not accomplish your purpose" and that anyone attempting to operate a hydraulic fracturing operation at less than high pressure would "find [themselves] going bankrupt." *Id.*; *see also id.* at 2065 ("That's not what the industry's all about."). Notwithstanding this unrebutted testimony, Halliburton repeatedly reverts to its theory that USWS admitted that hydraulic fracturing can be conducted at other than high pressure. *See* Resp. Br. 13. Simply because fracturing might possibly be attempted at other pressures does not mean that a skilled hydraulic-fracturing artisan would be unable to reasonably understand how to use standard high-pressure fracturing pumps to fracture a subterranean formation, as claimed.

Finally, Halliburton attempts to dismiss the relevance of *U.S. Well Services, LLC v. TOPS Well Services, LLC*, No. 3:19-cv-00237, 2020 WL 9439469 (S.D. Tex. Sept. 18, 2020), but that district court decision is

informative here.  The Board dismissed the relevance of the *TOPS* decision while relying on a separate district court decision, which held that USWS's claim language was indefinite.  *See* Appx0031-0033.  While USWS ultimately disagreed with that court's claim construction, *see* Appx0033, the district court's ability to construe the claim limitation is informative.  Opening Br. 55.

First, the *TOPS* court's decision confirms that it is not impossible to reach a numerical construction of the limitation.  The Board and Halliburton failed to appreciate this fact.  USWS references the *TOPS* decision to demonstrate that if the Board truly believed that a numerical range was necessary, the Board could have construed one.  USWS did not argue that the Board should have adopted the numerical range in the *TOPS* decision, as the overlapping range provided by USWS's experts could have easily been adopted here as the best supported range on the record.

Second, it is of little moment that the *TOPS* decision related to different patents.  The *TOPS* decision considered that same "configured to" language as the '732 patent.  *See* 2020 WL 9439469, at *1.  If anything, Halliburton's point underscores USWS's argument that the "configured

to pump . . . at high pressure" is entirely tangential to the asserted advance here, which relates to wireless remote monitoring of proppant usage.

Third, Halliburton's "procedurally dubious" argument is of no moment. *See* Resp. Br. 23. USWS does not rely on the *TOPS* decision as precedential support; nor does USWS assert that the Board was bound by it. Rather, the *TOPS* decision is another datapoint showing that "high pressure" is amenable to construction such that a skilled hydraulic-fracturing expert would reasonably know how to make and use the claimed proppant-monitoring system. At a minimum, a skilled artisan would be reasaonbly certain that "configured to pump . . . at high pressure" refers a fracturing pump that is configured to pump from 8,000 psi to 12,000 psi, consistent with the unrebutted testimony of USWS's experts.

## VIII. There Was No Waiver

Halliburton alleges that USWS's argument is forfeited, but the issue of whether USWS's claim would be understood by a person of skill in the art is the central issue addressed by the Board. USWS's appeal relies on the numerous descriptions and discussions of "high pressure" in the record, all of which the Board had the opportunity to consider. *See*

Opening Br. 11-12, 43-48.  Many of the exhibits evincing the common usage of "high pressure" are Halliburton's own exhibits.  They establish that a person skilled in the hydraulic-fracturing industry would easily understand which pumps are covered by the "configured to pump . . . at high pressure" limitation.  *See, e.g.,* Appx0918; Appx2224-2225; Appx2434; Appx2514; Appx2532; Appx3592; Appx3694.

Further, the Board's failure to consider how the claim limitation is understood in full context was legal error.  When considering the "asserted advance," a skilled artisan would be, for all the reasons stated herein, reasonably certain about how to operate the claimed system and perform the claimed method by using known electric-powered pumps "configured to pump . . . at high pressure."

## IX.  Conclusion

For the foregoing reasons, the Board's final written decision should be reversed.

Date: March 7, 2024                Respectfully submitted,

                                   By: */s/ Matthew J. Dowd*
                                   Matthew J. Dowd
                                   Robert J. Scheffel
                                   Dowd Scheffel PLLC

1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
mdowd@dowdscheffel.com
rscheffel@dowdscheffel.com

*Counsel for Appellant*
*U.S. Well Services, LLC*

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-2106

**Short Case Caption:** U.S. Well Services, LLC v. Halliburton Energy Services, Inc.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✔]    the filing has been prepared using a proportionally-spaced typeface and includes 6,210 words.

[ ]    the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ]    the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 03/07/2024        Signature: /s/ Matthew J. Dowd

                        Name: Matthew J. Dowd